*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1130**

State of Minnesota,
Appellant,

vs.

Leann Bobleter Sargent,
Respondent.

**Filed February 17, 2015
Reversed and remanded
Hooten, Judge**

Hennepin County District Court
File No. 27-CR-13-3314

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for appellant)

Kirk M. Anderson, Anderson Law Firm, PLLC, Minneapolis, Minnesota (for respondent)

Considered and decided by Hooten, Presiding Judge; Rodenberg, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

In this sentencing appeal, the state challenges the district court's decision to grant respondent a downward durational departure. Because the district court's stated reasons

for the departure are improper and there is insufficient evidence in the record to justify the departure, the district court abused its discretion. We therefore reverse and remand.

## FACTS

These facts are based primarily on the complaint. Respondent Leann Bobleter Sargent is the daughter of R.B. (decedent). From 2008 until decedent's death in 2012, Sargent held various fiduciary positions on behalf of decedent. She was the co-trustee of decedent's trust and held a power of attorney for decedent. Pursuant to the power of attorney, Sargent was permitted to conduct transactions on decedent's behalf involving decedent's real estate, personal property, bank accounts, and credit cards.

Decedent suffered from chronic kidney disease. After a hospitalization in January 2010, he moved into Sargent's home in Maple Grove and lived with her until his death in March 2012 at the age of 84. In November 2010, Sargent and decedent executed a personal care agreement and a room and board agreement, under which Sargent agreed to provide decedent with room, board, transportation, and other basic living needs in exchange for payment of a total of $2,000 per month. The total amount Sargent was entitled to under these agreements for the entire period of her caregiving was $24,000.

After decedent's death, Sargent's brother discovered that decedent's bank accounts were nearly empty. An investigation commenced which revealed that Sargent had withdrawn significant amounts of money from decedent's accounts beyond what was allowed under her agreements with decedent, and that she had used those funds for her own personal benefit, not for decedent's. The complaint alleges that, between April 2011 and March 2012, Sargent withdrew from decedent's checking account, and charged to his

2

credit cards, approximately $73,348 in excess of the amount she was entitled to under the agreements.

Shortly before decedent's death, Sargent used the power of attorney to orchestrate a real-estate transaction regarding decedent's cabin, which was unencumbered, and his townhouse, which was encumbered by a mortgage. Under decedent's will, the cabin was to be divided equally between Sargent and her brother upon decedent's death, while the townhouse was to pass to Sargent alone. On February 29, 2012, Sargent took out a $58,000 mortgage on the cabin. She used $38,836.37 from the new mortgage to satisfy the outstanding mortgage on the townhouse, which she inherited shortly thereafter. After decedent's death, Sargent's brother was forced to assume mortgage payments on the cabin in the amount of $587.22 per month.

In January 2013, Sargent was charged with one count of financial exploitation of a vulnerable adult (over $35,000), in violation of Minn. Stat. §§ 609.2335, subd. 1(1)(ii), .52, subd. 3(1) (2010). A pre-plea investigation report (PPI) indicated that Sargent's offense had a severity level of seven, her criminal history score was zero, and the presumptive sentence under the Minnesota Sentencing Guidelines was a stayed sentence of 36 months in prison. The PPI recommended a stay of imposition with a probationary period of 20 years.

A plea hearing was held in February 2014. At the commencement of the hearing, the district court described an off-the-record discussion with the prosecutor and Sargent's defense counsel about the sentence that would be imposed if Sargent were to enter a plea. The district court explained to Sargent that, during this off-the-record discussion, it had

3

advised Sargent's defense counsel that it would strongly consider imposing a stay of imposition and that Sargent could withdraw her plea and proceed to trial if it decided to sentence her "to anything other than a stay of imposition."

With this explanation, Sargent pleaded guilty to the sole count in the complaint, noting that she planned to request a downward departure to a gross misdemeanor sentence. Defense counsel and the prosecutor established a factual basis for the offense. Sargent acknowledged that decedent was a vulnerable adult during the relevant time period; she held a power of attorney for decedent; she intentionally took decedent's money for her own benefit and without his permission, in excess of $35,000; she had access to decedent's accounts and credit cards; she used decedent's money to purchase a number of items unrelated to decedent's care; and she wrote herself a number of checks from decedent's account for her own benefit. The district court determined that there was a sufficient factual basis to support a finding of guilt beyond a reasonable doubt. However, the district court deferred accepting Sargent's plea until sentencing, stating, "As I have told you, if I don't sentence you consistently with what I manifested to [c]ounsel[,] I will allow you to withdraw your plea."

Prior to sentencing, Sargent moved for a downward departure to a gross misdemeanor sentence. The state had previously moved for an upward durational departure, arguing that Sargent's offense was a "major economic offense" under Minnesota Sentencing Guidelines II.D.2.b(4) (2010).[1]  However, in its sentencing

_____

[1] Although throughout this opinion we cite to the 2010 version of the Minnesota Sentencing Guidelines, which was in effect at the time Sargent's offense began, we note

4

memorandum submitted after the plea hearing, the state instead argued that the district court should impose the presumptive guidelines sentence, not a gross misdemeanor sentence, because "the nature of her offense is more, not less serious, than the typical charge of [f]inancial [e]xploitation of a [v]ulnerable [adult]." The state opposed a stay of imposition, pointing to Sargent's alleged history of similar financial misconduct, the lengthy time period involved in this offense, Sargent's abuse of her fiduciary position, and the fact that her financial exploitation of decedent "involved many, many transactions [and] a sum well over the statutory minimum of $35,000." The state argued that Sargent's offense constituted a "major economic offense" and that gross-misdemeanor sentencing was not appropriate.

A sentencing hearing was held in April 2014. The prosecutor argued for the guidelines sentence. In responding to Sargent's request for a gross misdemeanor sentence, the prosecutor noted that "offender characteristics cannot be used under our law as a basis for that type of departure", and that the type of departure requested by Sargent could only be based upon offense characteristics. Sargent made several arguments in support of her motion for a downward departure: she had accepted responsibility for her offense, she was amenable to probation, she had no prior criminal record, she was significantly involved in her community, and she was elderly and in poor health. Sargent also argued that, with a felony conviction on her record, "she [would] lose her job on the [Maple Grove City Council]," she would lose her sales job, and she would lose her

---

that there were no substantive revisions to the applicable guidelines during the entire period of her offense.

5

housing. Sargent noted that financial exploitation was not a crime of violence, but was a property crime. She also emphasized that she did "a lot of things for [decedent] that most people wouldn't do for their parents, . . . feeding him, taking him to all his appointments, . . . [and] showering and cleaning him." Finally, Sargent noted that she planned to object to the anticipated amount of restitution, which was significantly higher than the statutory minimum of $35,000. She argued that the actual "extent of the financial exploitation," determined at a restitution hearing, would "weigh in on the seriousness" of the offense.

Before pronouncing its sentence, the district court acknowledged that, if it imposed a felony sentence, then Sargent might lose her city council job, which would impede her ability to pay restitution. Ultimately, the district court imposed a gross misdemeanor sentence of 365 days, with a stayed execution of two years.[2] The district court seemed to base the downward departure on Sargent's ability to pay restitution, her lack of a criminal record, and her amenability to probation. It stated that the sentence "constitutes what I see as a dispositional departure, while it's simply durational[.] The . . . specific reason[] for the departure [is] my finding of amenability to probation." On the departure report, the district court indicated that Sargent had received a dispositional departure and checked only one box in support of the departure: "Amenable to probation." The district court ordered Sargent to pay restitution of $107,348 to decedent's estate, $12,918.84 to her brother (for the mortgage payments he had already

---

[2] The district court orally imposed a probationary period of five years, but later corrected it to two years, consistent with a gross misdemeanor sentence. *See* Minn. Stat. § 609.135, subd. 2(c) (2010). Because we reverse and remand on other grounds, we do not need to address the state's argument that the district court's oral sentence was illegal.

made), and $587.22 per month (for future mortgage payments). According to the restitution order, Sargent had one year to pay the entire amount of restitution in full. She entered into a payment agreement, in which she agreed to pay $78 per month. This appeal followed.

## DECISION

We review a district court's decision to depart from the sentencing guidelines for an abuse of discretion. *State v. Peter*, 825 N.W.2d 126, 129 (Minn. App. 2012), *review denied* (Minn. Feb. 27, 2013). A guidelines sentence is "presumed to be appropriate," and the district court "shall" impose it unless there are "identifiable, substantial, and compelling circumstances" that support a different sentence. Minn. Sent. Guidelines II.D (2010); *see State v. Spain*, 590 N.W.2d 85, 88 (Minn. 1999) ("[A] sentencing court has no discretion to depart from the sentencing guidelines unless aggravating or mitigating factors are present."). Identifiable, substantial, and compelling circumstances "are those that make the case atypical." *Peter*, 825 N.W.2d at 129.

Sargent pleaded guilty to the felony-level offense of financial exploitation of a vulnerable adult. The sentencing guidelines provided for a presumptive stayed prison sentence of 36 months. *See* Minn. Sent. Guidelines IV–V (2010). This is a felony sentence. *See* Minn. Stat. § 609.02, subd. 2 (2010) ("'Felony' means a crime for which a sentence of imprisonment for more than one year may be imposed."). The district court sentenced Sargent to 365 days in jail, with a stayed execution of 245 days for a period of two years. This is a gross misdemeanor sentence. *See* Minn. Stat. §§ 609.02, subds. 2–4 (2010) (defining a gross misdemeanor as a crime with a sentence between 91 and 365

days in local jail), .135, subd. 2(c) (providing that a probationary stay for a gross misdemeanor "shall be for not more than two years"); *see also* Minn. Stat § 609.13 (2010) (providing that, if a defendant is convicted of a felony but a gross misdemeanor sentence is imposed, "the conviction is deemed to be for a . . . gross misdemeanor"). Because the presumptive sentence was a stayed sentence, the district court mischaracterized the departure as a downward *dispositional* departure, both on the record and in the departure report. In fact, it is a downward *durational* departure because the duration of Sargent's sentence was reduced by two-thirds, while the disposition of a stayed sentence was unchanged. *See State v. Bauerly*, 520 N.W.2d 760, 762 (Minn. App. 1994) (holding that a year-long sentence for an offense that carried a presumptive sentence of a year and a day is a downward durational departure), *review denied* (Minn. Oct. 27, 1994).

In 1985, the Minnesota Supreme Court prospectively adopted the following general rules governing when a district court's sentencing departure may be affirmed or reversed:

1. If no reasons for departure are stated on the record at the time of sentencing, no departure will be allowed.
2. If reasons supporting the departure are stated, [the reviewing] court will examine the record to determine if the reasons given justify the departure.
3. If the reasons given justify the departure, the departure will be allowed.
4. If the reasons given are improper or inadequate, but there is sufficient evidence in the record to justify [the] departure, the departure will be affirmed.
5. If the reasons given are improper or inadequate and there is insufficient evidence of record to justify the departure, the departure will be reversed.

8

*Williams v. State*, 361 N.W.2d 840, 844 (Minn. 1985).

Here, the district court gave reasons for its departure, both on the record and in the departure report. At the sentencing hearing, the district court cited three offender-related factors to justify the downward departure: facilitating Sargent's ability to pay restitution by ensuring that she could maintain her city council position, her lack of a criminal record, and her amenability to probation. The district court also stated, "The . . . specific reason[] for the departure [is] my finding of amenability to probation." On the departure report, the district court checked only one box as the reason for its departure: "Amenable to probation." The district court did not check the boxes, "Crime less onerous than usual," "Major economic offense," or "Shows remorse/accepts responsibility."

While offender-related factors such as those cited by the district court may support a dispositional departure, "[c]aselaw is settled that offender-related factors do not support durational departures." *Peter*, 825 N.W.2d at 130. Calling a durational departure "dispositional" cannot overcome "this limitation." *Id.* Instead, "[r]equests for durational departures require the district court to consider whether the conduct involved in the offense of conviction was significantly more or less serious than the typical conduct for that crime." *Id.* In other words, a district court must consider only offense-related factors, rather than offender-related factors, when deciding a request for a durational departure. Here, the district court erred by basing the downward durational departure solely on offender-related factors, rather than offense-related factors.

9

In fact, we note that all of the district court's stated reasons for the departure are improper or inadequate even for a dispositional departure. First, "ensur[ing] payment of restitution" is not a valid reason for a departure. *State v. Vahabi*, 529 N.W.2d 359, 361 (Minn. App. 1995); *see State v. Staten*, 390 N.W.2d 914, 916 (Minn. App. 1986) (holding that employment factors should not be used as reasons for departure); *see also* Minn. Sent. Guidelines cmt. II.D.101 (2010) (stating that potential impact on employment cannot support a departure from a guidelines sentence because employment is "highly correlated with sex, race, or income levels"). We also note that, by imposing a gross misdemeanor sentence with a probationary period of two years, and signing a restitution order that required Sargent to pay restitution of only $78 per month, the district court sabotaged its own goal of ensuring Sargent's payment of restitution in an amount exceeding $120,000.

Second, a defendant's lack of a criminal record is irrelevant to a departure because that fact is already taken into account in determining the guidelines sentence. *Bauerly*, 520 N.W.2d at 762; *see* Minn. Sent. Guidelines IV. Sargent's criminal history score of zero is what made this a presumptively stayed sentence in the first place. Third, the Minnesota Supreme Court has "never said that merely being amenable to probation—as opposed to being *particularly* amenable to probation—can justify staying a presumptively executed sentence." *State v. Soto*, 855 N.W.2d 303, 308 (Minn. 2014). "By requiring a defendant to be *particularly* amenable to probation, . . . we ensure that the defendant's amenability to probation distinguishes the defendant from most others and truly presents the substantial . . . and compelling circumstances that are necessary to

10

justify a departure." *Id.* at 309 (quotation omitted). There was no finding by the district court that Sargent was *particularly* amenable to probation and that such amenability constituted a substantial and compelling circumstance justifying the departure.

"If the reasons given are improper or inadequate, but there is sufficient evidence in the record to justify [the] departure, the departure will be affirmed." *Williams*, 361 N.W.2d at 844. We will affirm the district court's downward durational departure only if there is sufficient evidence in the record demonstrating that Sargent's conduct in committing her offense "was significantly . . . less serious than the typical conduct for that crime." *See Peter*, 825 N.W.2d at 130.

At the sentencing hearing, Sargent made several arguments on behalf of her requested downward departure, a self-described "laundry list" of offender-related factors:

1. acceptance of responsibility;
2. amenability to probation;
3. lack of a criminal record;
4. significant community involvement;
5. "because of this felony she will lose her job on the council," she will lose her sales job, and she will lose her housing;
6. old age; and
7. poor health.

None of these offender-related factors justify the district court's downward durational departure. *See id.*

On appeal, Sargent also argues that she is "extremely remorseful for her actions" and that, under *Bauerly*, remorse coupled with other factors can sometimes support a downward durational departure. "As a general rule, a defendant's remorse bears only on a decision whether or not to depart dispositionally, not on a decision to depart

11

durationally . . . ." *State v. Back*, 341 N.W.2d 273, 275 (Minn. 1983). "However, there may be cases in which the defendant's lack of remorse could relate back and be considered as evidence bearing on a determination of the cruelty or seriousness of the conduct on which the conviction was based." *State v. McGee*, 347 N.W.2d 802, 806 n.1 (Minn. 1984). In other words, remorse or lack of remorse is only relevant to a durational departure to the extent it sheds light on the seriousness of the defendant's conduct in committing the crime. *See Bauerly*, 520 N.W.2d at 762–63 (affirming a "minimal" downward durational departure based on the defendant's remorse *and* the fact that the defendant's theft offense was "significantly less serious than the typical offense" (quotation omitted)).

Sargent's argument fails for four reasons. First, the district court did not specifically find—either at the sentencing hearing or in the departure report—that Sargent showed remorse. Second, there is no indication that Sargent's alleged remorse relates back to the severity of her offense. We fail to see how her alleged remorse at the time of sentencing—after she had been charged and had pleaded guilty—renders her conduct at the time of the offense any less serious. Third, this court has never held that remorse *alone* is sufficient to support a downward durational departure, *see id.*, and Sargent has not demonstrated that any other substantial and compelling factors justify the departure. Fourth, unlike in *Bauerly*, the district court's downward durational departure in this case could hardly be called "minimal." *See id.* at 763.

While Sargent's arguments at the sentencing hearing focused mostly on offender-related factors, she did touch on offense-related factors. Her arguments are unpersuasive,

12

however, because nothing in the record indicates that her conduct was significantly less serious than the typical conduct involved in the felony-level offense of financial exploitation of a vulnerable adult. First, the nature of the offense as a property crime says nothing about the seriousness of Sargent's conduct because every crime of this type is a property crime. Next, Sargent's argument that the extent of her personal care and assistance to her father should somehow mitigate the gravity of her lengthy and well-planned financial exploitation rings hollow. Nonetheless, she repeats this same argument on appeal and expands upon it:

> It is not disputed that [Sargent] was the sole caregiver for her ailing father during the final year of his life and that she had to put her life on hold for him, which made it very difficult for her to continue in her real estate career. Additionally, [Sargent] acknowledged that she felt entitled to some of the monies as compensation for her time in caring for him, and she also contended that her father did give permission to her use of some of the monies even though she did not have any proof.

These rationales simply do not mitigate Sargent's culpability. As her father's live-in caregiver, she was contractually entitled to $2,000 per month for her care, and she received this money. She was entitled to nothing more.

Finally, Sargent points to the extent of the restitution in this case, and she is correct that the amount of loss is relevant to the seriousness of her offense. *See id.* at 763 (noting that, in a felony-theft case, "[t]he value of the property [the defendant] stole is a relevant factor to consider in a durational departure"). However, in this case, the district court ordered restitution in an amount over $120,000, in addition to the monthly mortgage payment. This represents almost three-and-a-half times the minimum offense

amount of $35,000.  *See* Minn. Stat. § 609.52, subd. 3(1).  Given the substantial amount of restitution ordered in this case, we cannot conclude that Sargent's conduct was *significantly less serious* than the typical conduct for this offense, as is required for a downward durational departure.  *See Peter*, 825 N.W.2d at 130.

In fact, throughout this case, the state has argued that Sargent's conduct was *more serious* than in the typical case.  The state summarizes these arguments on appeal: "[Sargent] exploited her father's vulnerability and used a position of trust to steal money from his estate for her personal gain. . . .  [H]er crime was not a momentary impulse.  It was a well-planned, deliberate assault on her father's financial legacy."  The state also argues that a gross misdemeanor sentence "is in no way proportionate to the severity of [Sargent's] crime" because she stole over 100 times the statutory limit for a gross misdemeanor offense.  *See* Minn. Stat. § 609.52, subd. 3(4) (defining gross misdemeanor theft as stealing between $501 and $1000).  We find the state's arguments persuasive. Sargent's argument that "[t]he district court's sentence severely punishes [her] for her actions" is unpersuasive.

The district court strongly suggested that it found Sargent's conduct was not significantly less serious for this type of crime.  At the sentencing hearing, the district court acknowledged the seriousness of her conduct: "If I [order a felony sentence], I'd be accomplishing one goal, which is *an accounting of the type of offense that was*

*perpetrated here*, an offense that took a long time to commit, an offense that required scienter, a mental disposition, a planning, an orchestration."[3]  (Emphasis added.)

The record demonstrates that Sargent's conduct was not significantly less serious than the conduct involved in the typical felony-level offense of financial exploitation of a vulnerable adult.  Because there are no identifiable, substantial, and compelling circumstances that justify a downward durational departure in this case, the district court abused its discretion in granting the departure.  We reverse Sargent's gross misdemeanor sentence and remand for resentencing consistent with this decision.[4]

**Reversed and remanded.**

---

[3] Despite this acknowledgement, the district court seemed very concerned about the potential job ramifications of ordering a felony sentence.  After pronouncing the gross misdemeanor sentence, the district court acknowledged that allowing Sargent to keep her job on the city council, which would facilitate her ability to pay restitution, was part of its sentencing rationale.  The state argues on appeal that, while "[t]he district court's decision was likely well intended," the downward departure "creates the impression that public officials who engage in criminal behavior get special treatment in the justice system."  We agree with the state's concern and are mindful of the need for the appearance of fairness in the criminal justice system.  *Cf. Offutt v. United States*, 348 U.S. 11, 14, 75 S. Ct. 11, 13 (1954) ("[J]ustice must satisfy the appearance of justice.").
[4] We note that, if on remand the district court orders a stay of imposition, this would not be a sentencing departure.  *See* Minn. Sent. Guidelines cmt. III.A.101 (2010).